DAVID WILLIAMS,

                **Plaintiff,**

-vs-                                         **Case No. 6:08-cv-1771-Orl-31GJK**

UNITED STATES OF AMERICA and
NORM LIVINGSTON,

                **Defendants.**

_____

# ORDER

This matter came before the Court without oral argument upon consideration of

Defendants', the United States of America (the "Government") and Norm Livingston

("Livingston") (collectively, "Defendants"), Motion for Summary Judgment (the "Motion") (Doc.

35), and Plaintiff's, David Williams ("Plaintiff"), response in opposition thereto (the "Response")

(Doc. 42). Defendants did not file a reply and the time for doing so has now passed.

## I. Overview

This tort case arises out of an alleged battery and detention that occurred on February 23,

2006 after the termination of Plaintiff's employment at the Naval Air Warfare Center Training

Systems Division ("NAVAIR") in Orlando, Florida. Of the remaining counts in the Compliant,[1]

---

[1]Other counts in the Complaint – Count II (Intentional Infliction of Emotional Distress against the Government), Count IV ( False Arrest against the U.S. Navy), Count V (Intentional Infliction of Emotional Distress against the U.S. Navy) and Count VI (Battery against the U.S. Navy) – have been dismissed or abandoned. More specifically, on January 28, 2009, the Court dismissed Count II without prejudice because Plaintiff failed to allege extreme and outrageous conduct and dismissed Counts IV, V and VI with prejudice because the U.S. Navy is not subject to suit under the Federal Tort Claims Act. (Doc. 19). Although Plaintiff was given leave to re-assert Count II, he failed to timely do so.

Count I asserts a claim for false arrest against the Government under Florida common law pursuant to the Federal Tort Claims Act ("FTCA").[2] (Doc. 1, ¶¶ 18-24). Count III asserts a battery claim against the Government under Florida common law pursuant to the FTCA. (Doc. 1, ¶¶ 35-41). Count VII purports to assert multiple *Bivens*[3] claims against Livingston for various Constitutional violations. (Doc. 1, ¶¶ 66-78).[4] Each count is predicated on the actions of Livingston,[5] NAVAIR's head of security.

In their Motion, Defendants contend, *inter alia*, that they are entitled to a judgment as a matter of law on all remaining counts in the Complaint because Livingston is entitled to qualified immunity. The Government has not invoked any of the exceptions to the FTCA's waiver of its sovereign immunity,[6] the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

---

[2]*See* 28 U.S.C. § 1346(b).

[3]*See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) [hereinafter "*Bivens*"].

[4]The exact contours of Count VII are not entirely clear. Rather than setting out each Constitutional claim as a separate count, Plaintiff lumped all of his *Bivens* claims together in a single count. (Doc. 1 at 13). As discussed further, *infra*, Plaintiff broadly asserts that Livingston violated his rights under the First, Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution. (Doc. 1, ¶ 72). On September 29, 2009, the Court dismissed Plaintiff's First Amendment claim with prejudice. (Doc. 33).

[5]While *Bivens* claims are brought against federal employees in their individual capacities, FTCA claims are brought against the United States in its capacity as an employer. *Denson v. U.S.*, 574 F.3d 1318,1323 n.1 (11th Cir. 2009); *see also* 28 U.S.C. § 1346(b)(1).

[6]*See generally* 28 U.S.C. § 2680; *see also, e.g.*, *Nguyen v. U.S.*, 556 F.3d 1244 (11th Cir. 2009).

## II. Background

### A. Undisputed Facts

#### 1. NAVAIR

NAVAIR is a secure military facility that performs classified work for the Navy, Marine Corps and Army. (Doc. 35-3 at 7, McCracken Dep. at 19). To access NAVAIR, an individual must have a secret clearance or be escorted at all times by security personnel. (Doc. 35-3 at 4 and 7, McCracken Dep. at 6-7 and 19).

#### 2. Parties

##### Plaintiff

Plaintiff began working as an electrical and computer engineer at NAVAIR in 1981. (Doc. 35-1 at 5, Williams Dep. at 6-7). Plaintiff was at all material times a civil service employee – not a member of the armed services. (Doc. 35-1 at 6, Williams Dep. at 9-10). Plaintiff was also the chief union steward of the American Federation of Government Employees, Local 2113, at NAVAIR. (Doc. 35-1 at 6-7, Williams Dep. at 10 and 15-16).

##### Livingston

Livingston was responsible for the day-to-day security of NAVAIR and was in charge of the facility's police officers, gate guards, and visitors' access. (Doc. 35-3 at 7, McCracken Dep. at 19-20). He was authorized by NAVAIR's Commanding Officer to make on-the-spot decisions regarding an individual's access to the facility and could direct or otherwise remove an individual from NAVAIR. (Doc. 35-3 at 7, McCracken Dep. at 19-20). Livingston was sometimes present when employees at NAVAIR were terminated and would oversee their removal from the premises. (Doc. 35-2 at 6-7 and 29, Livingston Dep. at 20-21 and 111).

### 3. Relevant Witnesses

<u>Gary Fraas</u>

Fraas was Plaintiff's "second level" supervisor at NAVAIR. (Doc. 35-4 at 3, Fraas Dep. at 8). While Plaintiff reported directly to another supervisor, Fraas made the decision to terminate Plaintiff and the termination took place in Fraas' office. (Doc. 35-4 at 3 and 11, Fraas Dep. at 8 and 40).

<u>Shannon Smith</u>

Smith was a human relations specialist at NAVAIR. (Doc. 42-24 at 11, Smith Dep. at 11). She researched labor and employment issues and consulted with supervisors regarding disciplinary actions and terminations. (Doc. 42-24 at 13-14, Smith Dep. at 13-14). Smith was in Fraas' office during Plaintiff's termination and requested that Livingston be present during the termination. (Doc. 42-24 at 18-19, Smith Dep. at 18-19).

<u>Lorraine Tuliano</u>

Tuliano was an electrical engineer and the president of the union at NAVAIR. (Doc. 35-6 at 3, Tuliano Dep. at 5). As the union president, she was present in Fraas' office during Plaintiff's termination. (Doc. 35-6 at 6, Tuliano Dep. at 20).

<u>LaKeisha Dickerson</u>

Dickerson was a police officer at NAVAIR. (Doc. 35-3 at 15, Dickerson Dep. at 9). She was responsible for escorting Plaintiff around NAVAIR on February 23, 2006[7] and was present

---

[7]Because Plaintiff had been placed on administrative leave, as discussed, *infra*, his security clearance had been revoked and he required a security escort.

directly outside Fraas' office during Plaintiff's termination.  (Doc. 35-3 at 16 and 17, Dickerson

Dep. at 15 and 17).

### 4. Plaintiff's Termination

On November 14, 2005, Plaintiff was placed on administrative leave pending a final

decision by Fraas as to whether Plaintiff's employment should be terminated.  (Doc. 35-3 at 10-

11).  According to the terms of his administrative leave, NAVAIR's Commanding Officer ordered:

> Your [security] badge will be confiscated while you are on administrative
> leave.  Should you need access to [NAVAIR] during normal business hours, please
> contact the Director of Security, Mr. Norm Livingston . . . at least one full business
> day in advance. . . .  You will need to specify your reason for access, where you
> intend to visit plus visit time and duration as part of your request.  You must submit
> this request at least one full business day in advance to give the command adequate
> time to evaluate your request and ensure adequate resources are available to escort
> you while you are in the building.

(Doc. 35-3 at 10).

On February 23, 2006, Plaintiff arrived at NAVAIR sometime after lunch and was working

with Tuliano in the union office.  (Doc. 35-1 at 23, Williams Dep. at 79).  Because Plaintiff was

still on administrative leave, he needed prior authorization to access NAVAIR.  According to

Plaintiff, he had been given access until 6:00 p.m that day.[8]  Around 3:30 p.m., Tuliano received a

call from Fraas, who informed her that he had made a final decision on Plaintiff's employment and

that he wanted to meet with Plaintiff in his office.  (Doc. 35-4 at 14, Fraas Dep. at 51).

Approximately fifteen minutes later, Plaintiff, Tuliano and Dickerson – Plaintiff's security escort –

---

[8]It is unclear who authorized Plaintiff to be at NAVAIR on February 23, 2006 and where
Plaintiff was authorized to go.  Neither Livingston nor Plaintiff provided any testimony on this issue.
Plaintiff simply testified that he believed he was authorized to be at NAVAIR until 6:00 p.m.  (Doc.
35-1 at 25, Williams Dep. at 87).  Defendants, however, do not appear to dispute that, prior to being
terminated, Plaintiff had been authorized to be at NAVAIR until 6:00 p.m. on February 23, 2006.

proceeded to Fraas' office. When they arrived, Fraas, Smith and Livingston were present in Fraas' office. (Doc. 35-4 at 15, Fraas Dep. at 54). Plaintiff stood in the doorframe to Fraas' office, with Tuliano at his side, and Dickerson stood in the corridor outside Fraas' office. Fraas walked over to Plaintiff, informed him that he had been terminated and handed Plaintiff his termination papers. (Doc. 35-4 at 16, Fraas Dep. at 58). Plaintiff took the papers, signed an acknowledgment and handed it back to Fraas. Plaintiff was cooperative in receiving and signing the papers, was quiet and did not otherwise display any sort of aggression.[9] (Doc. 35-4 at 16, Fraas Dep. at 58). Fraas handed the papers to Smith, who then left the office to make copies. Fraas then asked Plaintiff if he had any questions and Plaintiff said "no comment." (Doc. 35-1 at 25, Williams Dep. at 85). When Smith returned to Fraas' office with the copies, Livingston asked Fraas if he was finished; Fraas said that he was. (Doc. 35-4 at 16, Fraas Dep. at 60).

**B. Disputed Facts**

Taking the facts in the light most favorable to Plaintiff, once Fraas had indicated that he was finished, Livingston immediately started to barrage Plaintiff with questions about his computer access card.[10] Without giving Plaintiff any meaningful opportunity to respond, Livingston repeatedly asked Plaintiff to turn over his card. (Doc. 35-1 at 25, Williams Dep. at 85-87). When

_____

[9]Before coming to Fraas' office, Plaintiff knew that Fraas had made a final decision on whether to terminate his employment; he did not know, however, what the decision would be. Regardless of what Fraas had decided, however, Plaintiff expected that he would just pick up the papers and return to the union office. (Doc. 35-1 at 27, Williams Dep. at 96). In contrast, when Livingston learned that Plaintiff was going to be terminated, he had every intention of ensuring that Plaintiff was removed from NAVAIR as soon as Plaintiff received his termination papers. (Doc. 35-2 at 29, Livingston Dep. at 111).

[10]Plaintiff's computer access card was separate from his security badge, which had already been confiscated when Plaintiff was placed on administrative leave.

it became clear that Plaintiff did not have the card, Livingston told Plaintiff that they needed to go.[11]  Plaintiff then told Smith – not Livingston – "no, I have permission to be here until 6:00 p.m." (Doc. 35-1 at 25 and 28, Williams Dep. at 87 and 99).  Tuliano then asked Smith, who knew that Plaintiff had been authorized to do union work at NAVAIR that day,[12] what arrangements could be made for Plaintiff to complete his union work that day.  (Doc. 35-1 at 25, Williams Dep. at 87). Livingston then told Tuliano that he was not speaking to her and that he was speaking to Plaintiff. (Doc. 35-6 at 33, Tuliano Dep. at 22-23).  While Tuliano continued to appeal to Smith, Livingston suddenly rushed at Plaintiff[13] and grabbed Plaintiff's right bicep and forearm, holding them in a very firm "vise grip."  (Doc. 35-1 at 25-26, Williams Dep. at 88-89).  When Plaintiff told Livingston to get his hands off him, Livingston twisted Plaintiff's arm and held it straight behind Plaintiff's back, forcing Plaintiff to bend down at the waist.[14]  (Doc. 35-1 at 26, Williams Dep. at

---

[11]"[H]e made some sort of a statement, we need to go, or something like that, or we need to leave.  Something to that effect."  (Doc. 35-1 at 25, Williams Dep. at 87).  Plaintiff also testified that Livingston later said something under his breath, to the effect of, "you're out of here."  (Doc. 35-1 at 28, Williams Dep. at 99).

[12]Smith, however, testified that, on February 23, 2006, she could not remember whether Plaintiff was authorized to be at NAVAIR until 6:00 p.m. (or, for that matter, until any other specific time).  (Doc. 42-25 at 1-4, Smith Dep. at 31-34).

[13]Dickerson testified that Livingston never "rushed" Plaintiff and that before there was any physical contact, Livingston had repeatedly told Plaintiff that he needed to leave NAVAIR.  (Doc. 35-3 at 20, Dickerson Dep. at 31).  Similarly, Fraas and Smith testified that Livingston had made it clear that he would be escorting Plaintiff from NAVAIR immediately and that Livingston never appeared to rush Plaintiff.  (Doc. 35-4 at 17, Fraas Dep. at 63); (Doc. 42-25 at 42, Smith Dep. at 42).  Tuliano, however, who was standing next to Plaintiff, testified that Livingston just "exploded, and rushed right past me and attacked [Plaintiff]."  (Doc. 35-6 at 8, Tuliano Dep. at 25).

[14]Livingston testified that prior to ever taking hold of Plaintiff's arm, Plaintiff had become noncompliant and that he felt the situation could escalate.  (Doc. 35-2 at 32-33, Livingston Dep. at 123-125).  Livingston's assessment was based, in part, upon an incident that allegedly occurred in 2004.  According to Livingston, he had previously escorted Plaintiff from NAVAIR in 2004 when Plaintiff was put on administrative leave pending review of a workplace violence charge (Plaintiff's

89). Plaintiff then instructed Tuliano to tell Livingston to "get his hands off me." (Doc. 35-1 at 26, Williams Dep. at 89). Livingston started stomping his feet and yelled "stop resisting, stop resisting, stop resisting." (Doc. 35-1 at 26, Williams Dep. at 89). Tuliano spoke up and said "he's not resisting," but Livingston proceeded to forcibly push Plaintiff out of the doorframe and started moving him down the corridor and towards the elevator.[15] (Doc. 35-1 at 26, Williams Dep. at 90). As the two were moving down the corridor, Plaintiff's legs suddenly came out from underneath him and he fell to the ground, landing on his shoulder and face.[16] (Doc. 35-1 at 26, Williams Dep. at 90). While Plaintiff was lying flat on his stomach, Livingston put both his knees on top of

---

administrative leave in 2004 was separate and apart from the administrative leave in 2005 that resulted in his termination on February 23, 2006. (Doc. 35-2 at 46, Livingston Dep. at 177-78). Although Plaintiff was ultimately cleared of the workplace violence charge, Livingston swore that Plaintiff was uncooperative during his removal in 2004 and that he had created a scene outside the union office with Tuliano which had the potential of becoming violent. (Doc. 35-2 at 45, Livingston Dep. at 174-77). Plaintiff's and Tuliano's testimony, *inter alia*, strongly disputes Livingston's account of the incident. (*See* Doc. 42 at 12). For purposes of this Order, and upon careful review, the Court sees no need to engage in a "mini-trial" on this issue. While Livingston may have had reason to believe that Plaintiff could be uncooperative on February 23, 2006, it is far from clear that a reasonable officer, with Livingston's knowledge of the 2004 incident, would have known that Plaintiff could be violent, aggressive, or a threat to others.

[15]In a voluntary statement prepared just after the incident, Dickerson swore that "Livingston took Williams by the right arm and began to physically escort him" and that Plaintiff would comply by taking a few steps but would then attempt to stop and ask questions. (Doc. 35-4 at 31).

[16]Livingston testified that he deliberately took Plaintiff to the ground by executing an "arm bar takedown." (Doc. 35-2 at 34, Livingston Dep. at 132). Tuliano and Dickerson appear to be the only individuals to have actually seen the takedown. Tuliano testified that Livingston twisted Plaintiff's "arm up around his back, and pushed it up high and forced him to the ground." (Doc. 35-6 at 8, Tuliano Dep. at 27). Dickerson testified that the takedown was done "correctly" and amounted to a minimal use of force. (Doc. 35-3 at 22, Dickerson Dep. at 38 and 65-67). However, Dickerson also testified that she felt Livingston's use of force was excessive and that, if she had had an opportunity to talk to Plaintiff, she may have been able to convince him to leave voluntarily. (Doc. 35-3 at 30, Dickerson Dep. at 70). Dickerson's deposition testimony regarding Livingston's "minimal use of force" is further contradicted by her prior statement to Naval investigators that she "felt it was an excessive use of force" and that she "did not think it was necessary at all." (Doc. 42-1 at 12).

Plaintiff's spine, positioning one knee between Plaintiff's shoulder blades and the other near Plaintiff's tail bone, and pressed down with his full body weight. (Doc. 35-1 at 26, Williams Dep. at 90). Plaintiff could not breathe and told Livingston as much, but Livingston continued to remain on top of him.[17] (Doc. 35-1 at 26, Williams Dep. at 91). Livingston then handcuffed Plaintiff and called for backup. (Doc. 35-1 at 26, Williams Dep. at 91). When military police finally arrived, Livingston got off Plaintiff's back and Plaintiff eventually stood. (Doc. 35-1 at 26, Williams Dep. at 92). He was then taken down the elevator and put into a conference room within NAVAIR's police office,[18] where he remained handcuffed until an Orange County Sheriff's Deputy arrived and issued Plaintiff a trespass warning.[19]

### C. Navy's Internal Investigation

At Plaintiff's request, the Commander of the Navy, Southeast Region, Office of Inspector General ("CNRSE"), conducted an internal investigation of the foregoing and issued a report in early January, 2007. (Doc. 42-1 at 1). The report found, *inter alia*, that Plaintiff's allegations of

---

[17]Plaintiff testified that Livingston remained on top of him for approximately three minutes. (Doc. 35-1 at 30, Williams Dep. at 108). Tuliano testified that Plaintiff was probably on the ground for "four or five, maybe six minutes." (Doc. 35-6 at 9, Tuliano Dep. at 29). Dickerson testified that it was approximately two to three minutes. (Doc. 35-3 at 23, Dickerson Dep. at 44).

[18]NAVAIR's police office is apparently only an administrative facility. It does not contain any sort of holding cells or other facilities for handling detainees.

[19]Neither the Motion nor the Response indicates how long Plaintiff was kept in handcuffs or for how long Plaintiff was detained. Livingston testified, however, that it was roughly 4:15 p.m. or so when Plaintiff was initially handcuffed. (Doc. 35-2 at 37, Livingston Dep. at 143-44). Similarly, Plaintiff testified that he was brought into NAVAIR's police office around 4:15 p.m. (Doc. 35-1 at 31, Williams Dep. at 111). The trespass warning issued by the Orange County Sheriff's deputy states that it was written out at approximately 5:30 p.m. (Doc. 42-30 at 15). The Navy's internal investigation, discussed, *infra*, concluded that Plaintiff was handcuffed and detained for approximately one and one-half hours. (Doc. 42-1 at 15).

excessive force and excessive detention were substantiated, and that Livingston should be held accountable for his actions.[20]  (Doc. 42-1 at 2).  CNRSE based its findings on the Navy Law Enforcement Manual and *Graham v. Connor*, 490 U.S. 386 (1989).  (Doc. 42-1 at 2 and 10).

The key findings from CNRSE's report were that: (1) witnesses saw no resistance on the part of Plaintiff to being removed from NAVAIR; (2) Livingston's statement that he took Plaintiff down for his own safety and for the safety of others did not seem rational and was contradicted by eyewitness testimony; (3) Dickerson,[21] a well-trained and experienced police officer, did not consider any of Plaintiff's actions threatening; and (4) Plaintiff's being handcuffed for approximately one and one-half hours was excessive.  (Doc. 42-1 at 12 and 15).

### D.  Plaintiff's Injuries

Plaintiff testified that the only physical injury he suffered was soreness (specifically, soreness in his shoulder and face).  (Doc. 35-1 at 32, Williams Dep. at 114).  He did not go to the emergency room and testified that most of his discomfort had subsided by the time he was able to make the first available appointment with his primary doctor.  (Doc. 35-1 at 32, Williams Dep. at 114).  Plaintiff, however, still has anxiety from the incident.  (Doc. 35-1 at 32, Williams Dep. at 115).

---

[20]CNRSE did not make any specific disciplinary recommendations in its report and Livingston testified that he did not receive any sort of disciple as a result of the investigation.  (Livingston Dep. at 152).

[21]The Court has only a redacted version of the report.  Although Dickerson is not identified by name in the report, the report's use of gender-specific pronouns, discussion of certain physical attributes, and emphasis on the witness' police training – when compared to Dickerson's deposition testimony – clearly establish Dickerson's identity in relevant portions of the report.

## III.  Standard of Review

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1351-52 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324-25 (internal quotations and citations omitted).  Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

In determining whether the moving party has satisfied its burden, the Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the

motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59.

## IV. Discussion

The Court's analysis proceeds in three parts. In Part A, the Court delineates the contours of Plaintiff's *Bivens* claim(s) against Livingston. In Part B, the Court addresses whether Livingston is entitled to qualified immunity. In Part C, the Court considers Plaintiff's FTCA claims against the Government.

### A. Plaintiff's *Bivens* Claims

The Supreme Court in *Bivens* created a private cause of action for damages against federal agents who violate the Fourth Amendment to the United States Constitution. 403 U.S. 388, 396-91 (1971); *Ashcroft v. Iqbal*, - - - U.S. - - -, 129 S.Ct. 1937, 1948 (2009). This "constitutional tort" is the federal analog to 42 U.S.C. § 1983. *Hartman v. Moore*, 547 U.S. 250, 254 (2006); *see also Butz v. Economou*, 438 U.S. 478, 500 (1978). Although *Bivens* itself was concerned with Fourth Amendment violations, 403 U.S. at 389-90, subsequent decisions have found other implied causes of action against federal officials, including those for violations of the Eighth and Fifth Amendments. *See*, *e.g*, *Carlson v. Green*, 446 U.S. 14 (1980); *Davis v. Passman*, 442 U.S. 228 (1979).

In the instant case, Plaintiff broadly asserts, in a single count, that Livingston violated his Fourth, Fifth and Fourteenth Amendment rights. (Doc. 1, ¶¶ 68-78). With respect to violations of the Fourth and Fourteenth Amendments, Plaintiff alleges that Livingston "illegally detained, battered, handcuffed, or caused Plaintiff to be detained and battered and deprived [sic] of his

liberty" without probable cause. (Doc. 1, ¶¶ 68-69).[22]  Plaintiff further alleges that Livingston

violated his Fourth and Fourteenth Amendment rights by using "force and excessive force." (Doc.

1, ¶¶ 69).  The Complaint does not specify the manner in which Plaintiff's Fifth Amendment rights

were violated.

Livingston contends that Plaintiff has waived any claim arising under the Fifth Amendment

because Plaintiff failed to identify the basis for such a claim in his answers to Defendants'

interrogatories. (Doc. 35 at 1).  Livingston also argues that Plaintiff's Fourteenth Amendment

claim fails as a matter of law because the Fourteenth Amendment applies only to state actors, not to

federal officials; and that the Supreme Court has held that excessive force and wrongful detention

claims must be analyzed under the Fourth – and not the Fourteenth – Amendment. (Doc. 35 at 1,

quoting *Graham*, 490 U.S. at 395)).  Finally, Livingston contends that Plaintiff's Fourth

Amendment claim must be limited to the decision to arrest Plaintiff – not to the duration of

Plaintiff's detention. (Doc. 35 at 15, n. 14).

For his part, Plaintiff makes no mention of the Fifth Amendment in his Response.  Instead,

Plaintiff relies exclusively on the Fourth Amendment[23] and simply notes, in passing, that

Livingston's use of excessive force and decision to arrest Plaintiff amount to two separate

Constitutional violations. (Doc. 42 at 11-16 and at 11, n.15).  Regarding his false arrest claim,

Plaintiff does not indicate how long he believes he was wrongfully detained, and otherwise appears

---

[22]Plaintiff does not clearly allege, in the alternative, that Livingston used excessive force to effect an otherwise lawful arrest.

[23]Although the Response contains a subheading labeled "Livingston had fair warning that his actions violated Plaintiff's Constitutional Rights under the Fourth and Fourteenth Amendments," (Doc. 42 at 16), there is no other mention or any discussion of the Fourteenth Amendment.

to concede that "Livingston violated Plaintiff's rights by arresting him without probable cause" – not by detaining him for an excessive period of time. (Doc. 42 at 14).

It appears that Plaintiff has asserted only one *Bivens* claim for a violation of the Fourth Amendment. Although he asserts that his false arrest and excessive force claims are separate, Plaintiff has limited his false arrest claim to the circumstances of his arrest – i.e., whether the arrest itself violated his Fourth Amendment rights.

> "Under this Circuit's law . . . a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) (citing *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995)). The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989). It follows, then, if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest. This is the premise of [the plaintiff's] "excessive force" claim; but this is not what is meant by "excessive force." An excessive force claim evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force (i.e., non-de minimis force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest. When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest. A claim like [the plaintiff's] – that the deputies used excessive force in arrest because they lacked the right to make the arrest – is not a discrete constitutional violation; it is dependent upon and inseparable from his unlawful arrest claim. . . . [W]here an excessive force claim is predicated solely on allegations [that] the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim. . . .

*Bashir v. Rockdale Conty*, 445 F.3d 1323, 1331-32 (11th Cir. 2006). Accordingly, Plaintiff's excessive force claim is subsumed within his false arrest claim.[24] Furthermore, Plaintiff has waived

---

[24]Neither party addressed this issue in their briefs. Even assuming, however, that Plaintiff had asserted a distinct excessive force claim, within this circuit, the force Livingston employed was likely *de minimis* and therefore not excessive as a matter law. *See, e.g.*, *Durruthy v. Pastor*, 351 F.3d 1080 (11th Cir. 2003); *Nolin v. Isabell*, 207 F.3d 1253 (11th Cir. 2000); *Jones v. City of Dothan, Ala.*, 121

or abandoned any *Bivens* claims arising under the Fifth or Fourteenth Amendment and has otherwise failed to adduce any evidence in support of same. Livingston is therefore entitled to a judgment as a matter of law on Plaintiff's Fifth and Fourteenth Amendment claims in Count VII of the Complaint.

### B. Whether Livingston is Entitled to Qualified Immunity

*Bivens* rests on the assumption that all officials, whatever their position in government, must conform their conduct to the requirements of federal law. *Butz*, 438 U.S. at 506; *see also Denson*, 574 F.3d at 1347. The right to recover under *Bivens*, however, is balanced by the need to protect officials who are required to exercise their discretion and the public's interest in encouraging the vigorous exercise of official authority. *Butz*, 438 at 506. Accordingly, federal officials are generally accorded the same qualified immunity as state officials enjoy in cases arising under 42 U.S.C. § 1983. *Butz*, 438 at 500; *Nixon v. Fitzgerald*, 457 U.S. 731, 747 (1982).

The doctrine of qualified immunity protects federal and state officials from civil liability in the performance of "discretionary functions . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Assuming the official can established that he was acting within the scope of his discretionary authority, the burden then shifts to the plaintiff to show that the grant of qualified immunity is inappropriate. Under *Saucier v. Katz*, 533 U.S. 194 (2001), and *Pearson v. Callahan*, - - - U.S. - - -, 129 S. Ct. 808 (2009), an official is entitled to qualified immunity unless the plaintiff can demonstrate that: (1) the facts viewed in the light most favorable to the plaintiff establish a constitutional violation; and (2) the right at issue was "clearly

---

F.3d 1456 (11th Cir. 1997).

established" at the time of the official's alleged misconduct.[25]  *Pearson*, 129 S. Ct. at 815-16 (citing *Saucier*, 533 U.S. at 201); *see also*, *e.g.*, *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

As a threshold matter, Plaintiff disputes that Livingston was acting within the scope of his discretionary authority. According to Plaintiff, Livingston's authority to make on-the-spot decisions regarding the security of, and removal of individuals from, NAVAIR, is irrelevant. (Doc. 42 at 9). The contention is without merit.

NAVAIR's Commanding Officer had the authority to summarily exclude civilians from the area of his command – a secure facility performing classified work for the military. *See*, *e.g.*, *Cafeteria and Rest. Works Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886 (1961). That this authority was delegated to Livingston is of no moment; it is axiomatic that the military operates through a chain of command. Furthermore, military personnel can arrest civilians on-base whom they have probable cause to believe have violated civil law. 53A AM. JUR. 2d *Military* § 208 (current through Feb. 2010) ("Military personnel are authorized . . . to arrest and detain civilians for on-base violations of civil law, where these actions are based on probable cause."). Furthermore, from the moment Plaintiff was placed on administrative leave, he was specifically aware of the fact that NAVAIR's Commanding Officer had given Livingston authority over Plaintiff's access to NAVAIR. (Doc. 35-3 at 10-11). Accordingly, the Court finds that Livingston was acting within the scope of his discretionary authority at the time of his alleged misconduct.

---

[25]Courts now have discretion to decide which prong of the inquiry to address first. *Pearson*, 129 S. Ct. at 818.

### 1. Whether There Was a Constitutional Violation

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons[,] . . . against unreasonable . . . seizures, shall not be violated. . . ." U.S. Const. amend. IV. A law enforcement official violates an individual's right to be free from an unreasonable seizure when he makes an arrest without probable cause. *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997). Probable cause exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that a suspect has committed or was committing a crime. *U.S. v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992) (citations omitted). The existence of probable cause, at the time of a seizure, will bar a *Bivens* claim for false arrest. *Bivens*, 403 U.S. 389-90; *see also Case v. Eslinger*, 555 F.3d 1317, 1326-27 (11th Cir. 2009) (noting that probable cause is an absolute bar to a claim arising under 42 U.S.C. § 1983). A seizure occurs when an officer lays hands upon a suspect for the purpose of arresting him. *California v. Hodari D.*, 499 U.S. 621, 626-28 (1991).[26]

In determining whether qualified immunity exists on a claim for false arrest, the issue is not probable cause in fact, but "arguable" probable cause. *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (citations omitted). Indeed, a defendant need only demonstrate that arguable probable cause existed in order to be protected by qualified immunity. *Savaiko*, 117 F.3d at 1324; *see also Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Case*, 555

---

[26]A seizure can, of course, also occur where there is some show of authority to which the subject yields. *Hodari D.*, 499 U.S. at 627-28.

F.3d at 1327 (quotations and citations omitted).  This standard is an objective one and does not inquire into the officer's subjective intent or beliefs.  *Von Stein*, 904 F.2d at 579 (citations omitted).  An officer's subjective beliefs, however induced, are irrelevant to the inquiry.  *Rushing v. Parker*, - - - F.3d - - -, No. 09-12637, 2010 WL 918323, at *2 (11th Cir. March 16, 2010) (citation omitted).

Livingston contends that he had arguable probable cause to arrest Plaintiff because he[27] had a reasonable belief that Plaintiff:  (1) refused to leave NAVAIR, defying Livingston's authority, as delegated by NAVAIR's Commanding Officer, to remove individuals from NAVAIR; and (2) violated or was about to violate 18 U.S.C. § 111.[28]  (Doc. 35 at 13-17).  In support of these contentions, Livingston suggests that in the past Plaintiff was "confrontational, aggressive, noncompliant with orders, and intent on drawing Tuliano into the matter with the realistic potential of escalating the situation into a noisy, disruptive scene."  (Doc. 35 at 16).

---

[27]The Motion is written in terms of what Livingston believed.  The Court, however, has construed the Motion in terms of what a hypothetical reasonable officer, in Livingston's position and with Livingston's knowledge, could have believed.

[28]In pertinent part, 18 U.S.C. § 111 provides:

(a) In general.- - Whoever - -

(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties . . .

shall, where the acts in violation of this section constitute only simply assault, be fined . . .or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined . . .or imprisoned not more than 8 years, or both.

18 U.S.C. § 111(a)(1).

Plaintiff responds that Livingston's right to exclude Plaintiff from NAVAIR, on these facts, is hotly disputed. (Doc. 42 at 14). Although Livingston had the authority to grant or deny Plaintiff access to NAVAIR, Plaintiff notes that he had been given prior approval to remain at NAVAIR until 6:00 p.m. (Doc. 35 at 14). Livingston or NAVAIR's Commanding Officer never revoked that prior approval before arresting Plaintiff. With respect to 18 U.S.C. § 111, Plaintiff contends that no such charges were ever brought.[29] (Doc. 35 at 14-15). As for Plaintiff's prior conduct, Plaintiff points to a number of material differences between Livingston's account of the 2004 incident and the testimony of others. (Doc. 42 at 12).

The Court finds that there are disputed issues of material fact as to whether Livingston had arguable probable cause to arrest Plaintiff. At the outset, the Court notes that the moment of Plaintiff's arrest is unclear.[30] Taking the evidence in the light most favorable to the Plaintiff, however, the Court has assumed that Plaintiff's arrest occurred at the moment Livingston first took hold of Plaintiff's arm. The pertinent inquiry, then, is whether a reasonable officer, possessing Livingston's knowledge and faced with these same circumstances, could have believed that – at the

---

[29]Plaintiff's contention regarding 18 U.S.C. § 111 is without merit. The fact that Plaintiff was never charged with a crime has no bearing on whether Livingston had arguable probable to arrest him. *See*, *e.g.*, *U.S. v. Pulvano*, 629 F.2d 1151, 1156 n.5 (5th Cir. 1980) ("The fact that the . . . agents suspected appellant of criminal conduct other than for which he was lawfully arrested, is irrelevant to the legality of that arrest. Nor is it significant that appellant was never charged with the crime for which he was arrested.").

[30]Neither party addressed this issue in their briefs.

time of arrest – Plaintiff had committed, was committing, or was about to commit a crime.[31]  In short, the answer to that inquiry is no.

Even assuming that Plaintiff's 2004 incident would have given a reasonable officer cause to believe that Plaintiff could be uncooperative, that officer would have had very little, if anything else, to rely upon in forming his belief that a crime had been committed or was about to be committed.  Indeed, after Livingston stopped questioning Plaintiff about his computer access card and stated "we need to go,"[32] Plaintiff simply told Smith – not Livingston – "no, I have permission to be here until 6:00 p.m."[33]  Before making this statement to Smith, Plaintiff had displayed no signs of aggression to Livingston (or anyone else, for that matter) and had been completely cooperative.  He remained standing in the doorframe to Fraas' office and never once took a step towards Livingston.

Based on the disputed facts, no reasonable officer could have believed that Plaintiff had refused to leave NAVAIR or that Plaintiff had violated or was about to violate 18 U.S.C. § 111.

---

[31]The Court has simply assumed, without deciding, that, pursuant to prior precedent, statutes and various military regulations, Livingston had the right to exclude Plaintiff from NAVAIR and that Plaintiff's willful refusal to leave would amount to a crime.  *See*, *e.g.*, *McElroy*, 367 U.S. 886; 10 U.S.C. § 809(e); 18 U.S.C. § 1382;  U.S. Navy Regulation 0809, Ch. 8, ss 1-3.  Neither party, however, has clearly addressed this issue.

[32]According to Plaintiff and Tuliano, Livingston never once said anything to the effect of "Mr. Williams, I will be escorting you from the premises at this time, or "I have been authorized by the CO to remove you from NAVAIR immediately, come with me."  Other than "we need to go," Livingston appears, at most, to have uttered "you're out of here."  If true, "we need to go" and "you're out of here," in the circumstances of this case, can hardly be characterized as law enforcement instructions, let alone a display or statement of authority.

[33]In his Motion, Livingston appears to concede that, based on Plaintiff's account of events, this statement, coupled with the incident in 2004, are the only information that would have been available to a reasonable officer at the time of Plaintiff's arrest. (Doc. 35 at 15).

When Livingston said "we need to go," he had yet to display his authority or issue an order. Similarly, in telling a human relations specialist, with the president of the local union at his side, that he was authorized to remain on the premises until 6:00 p.m., Plaintiff did little more than initiate a discussion between Tuliano and Smith. If Livingston had made any effort to assert his authority or issue an order, and Plaintiff had then shown some sign of disobedience (e.g., again stating that he was not leaving), then a reasonable officer very well may have had cause to make an arrest. According to Plaintiff and Tuliano, however, that is not what happened. Livingston simply attacked Plaintiff. For the same reasons, then, Plaintiff's statement to Smith provided no basis for a belief that Plaintiff was about to "forcibly" assault, resist, oppose, impede, intimidate or interfere with a federal employee. 18 U.S.C. § 111(a).

### 2. Whether The Constitutional Violation Was Clearly Established

The second prong of the qualified immunity analysis requires the plaintiff to show that "the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1285 (11th Cir. 2000) (internal citations and quotations omitted). The conduct must have been clearly unlawful in light of pre-existing case law. *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) ("[T]he salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of the [the plaintiff] was unconstitutional.") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

There are at least three ways that a plaintiff can demonstrate that violations of his rights were clearly established. First, the plaintiff can show that a materially similar case – handed down

by the U.S. Supreme Court, the Eleventh Circuit, or the Florida Supreme Court – has already been decided which gave notice to the police. *Mercardo v. City of Orlando*, 407 F.3d 1152, 1158-59 (11th Cir. 2005). Second, the Plaintiff can show that a "broader, clearly established principle" should be controlling in light of the facts in his case. *Id.* at 1158. Third, the plaintiff can show that his case fits within the exception of conduct which so obviously violated the Constitution that no prior case law is necessary. *Id.*

On these disputed facts, no significant analysis is necessary. Binding precedent clearly holds that an arrest made without arguable probable cause – and the force incident to same – violates the Fourth Amendment. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1143 (11th Cir. 2007); *Davis v. Williams*, 451 F.3d 759, 764 n. 8 (11th Cir. 2006) ("There is no question that the second step – [whether the constitutional violation was] clearly established – is satisfied, as it is clearly established that an arrest made without probable cause violates the Fourth Amendment"); *Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998); *Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998); *Von Stein*, 904 F.2d at 579 ("We find that, at the time Defendants arrested Plaintiff, the law was clearly established that an arrest without probable cause to believe a crime had been committed violated the Fourth Amendment."). Accordingly, the violation of Plaintiff's constitutional rights was clearly established.

Based on the foregoing, whether Livingston is entitled to qualified immunity is a question that must be decided at trial.

### C. FTCA Claims

"As co-extensive causes of action, *Bivens* and FTCA claims necessarily arise from the same wrongful acts or omissions of a government official." *Denson*, 574 F.3d at 1336. However, a judgment entered on an FTCA claim – whether for or against the Government – will completely bar a *Bivens* claims based on the same conduct, irrespective of whether the *Bivens* and FTCA claims were brought seriatim or contemporaneously in the same lawsuit. *Denson*, 574 at 1334, n.50 (collecting cases and concluding that a majority of circuit courts have construed 28 U.S.C. § 2676[34] as barring a plaintiff's *Bivens* claims where judgment is entered on an FTCA claim based on the same subject matter); *see also, e.g., Estate of Trentadue ex rel. Aguilar v. U.S.*, 397 F.3d 840, 858 (10th Cir. 2005) (reversing judgment in favor of plaintiff pursuant to jury verdict on *Bivens* claims because district court subsequently entered judgment in favor of plaintiff on FTCA claims). Furthermore, if the plaintiff's *Bivens* claims fail, the court may lose subject matter jurisdiction over his FTCA claims. *Denson*, 574 at 1336-37 and 1347-48 (discussing 28 U.S.C. § 2680[35] and holding that the Supremacy Clause may also bar FTCA claims in certain circumstances). In light of

---

[34]28 U.S.C. § 2756 provides: "The judgment in an action under section 1346(b) of this title shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim."

[35]28 U.S.C. § 2680, *inter alia*, preserves the United States' sovereign immunity as to claims based upon the exercise or non-performance of a discretionary function or duty, and claims arising out of a battery or false arrest, by federal employees who are *not* "investigative or law enforcement officers." 28 U.S.C. § 2680(a) and (h); *Nguyen*, 556 F.3d 1244 (11th Cir. 2009) (holding that the discretionary function exemption in § 2680(a) does not apply to law enforcement officers). The Government concedes in its Motion that Livingston was a "law enforcement officer" for purposes of § 2680(h), (Doc. 35 at 11), and did not raise § 2680(a) or § 2680(h) as affirmative defenses in its Answer. (Doc. 20 at 3-4).

these and other considerations,[36] district courts have bifurcated proceedings involving *Bivens* and FTCA claims. *See*, *e.g.*, *Estate of Trentadue ex rel. Aguilar*, 397 F.3d at 858.

Given the interrelationship between *Bivens* and the FTCA, the procedural posture of this case, and the potential prejudice to Plaintiff's jury trial right, the Court will bifurcate proceedings. Once the jury and the Court have heard all the evidence on Plaintiff's *Bivens* claim, the Court will address the FTCA claims. Accordingly, the Court will defer ruling on the Government's Motion on Counts I and III.

## V. Conclusion

For the foregoing reasons, it is **ORDERED** and **ADJUDGED** that:

1. Defendants' Motion (Doc. 35) is **GRANTED** in part and **DENIED** in part.

2. Defendant Livingston is entitled to a judgment as a matter of law on Plaintiff's Fifth and Fourteenth Amendment claims in Count VII of the Complaint.

3. Pursuant to FED. R. CIV. P. 42(b), the Court will hold a trial by jury on Count VII of the Complaint, to be followed by a separate bench trial, if appropriate, on Counts I and III of the Complaint;

4. The Court's ruling on the Government's Motion as to Counts I and III of the Complaint is **DEFERRED**. If necessary, the parties will be given leave to supplement their briefs after the jury trial on Plaintiff's *Bivens* claim; and

---

[36]While Plaintiff has demanded and is entitled to a jury trial on his *Bivens* claim, *Carlson v. Green*, 446 U.S. 14, 22 (1980), his FTCA claims must be tried by the Court. 28 U.S.C. § 2402 ("[A]ny action against the United States under section 1346 shall be tried by the court without a jury . . . ."). Thus, one further consideration counseling in favor of bifurcation is Plaintiff's right to a jury trial. *See U.S. v. Yellow Cab. Co.*, 340 U.S. 543, 555-56 (1951) (suggesting bifurcation where FTCA claims are joined with claims carrying the right to a jury trial).

5.  Pursuant to the Court's Case Management and Scheduling Order, the trial term in this matter begins at 9:00 a.m. on June 1, 2010.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on April 2, 2010.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE